KENDALL BRILL & KELLY LLP
Richard B. Kendall (90072)
*rkendall@kbkfirm.com*
Zachary R. Glasser (329443)
*zglasser@kbkfirm.com*
10100 Santa Monica Blvd., Suite 2500
Los Angeles, California 90067
Telephone: 310.556.2700
Facsimile: 310.556.2705

Attorneys for New Regency Productions, Inc.

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION**

NEW REGENCY PRODUCTIONS, INC.,

Plaintiff,

v.

MICHAEL MANN,

Defendant.

Case No. 2:26-cv-13316

**COMPLAINT FOR DECLARATORY RELIEF**

Plaintiff New Regency Productions, Inc. (“Plaintiff” or “Regency”), asserts the following claims against Defendant Michael Mann (“Defendant” or “Mann”) and alleges as follows:

## NATURE OF ACTION

1. Regency brings this declaratory relief action against Mann, who has sent to Regency a series of notices, pursuant to Section 203(a) of the Copyright Act (17 U.S.C. § 203(a)), purporting to terminate Regency’s copyright interest in the screenplay he authored for the popular 1995 film entitled *Heat*. As explained below, these termination notices are defective and invalid.

2. The Copyright Act provides that “[i]n the case of any work ***other than a work made for hire***, the exclusive or nonexclusive grant of a transfer or license of copyright or of any right under a copyright, ***executed by the author*** on or after January 1, 1978 … is subject to termination ….” 17 U.S.C. § 203(a) (emphasis added).

3. Mann wrote the *Heat* screenplay (the “Screenplay”) as a “work made for hire” (as defined by Section 101 of the Copyright Act, *see* 17 U.S.C. § 101)—a fact that Mann stated repeatedly in written agreements that he personally signed, both on his own behalf and on behalf of companies that he controlled. As a work made for hire, the Screenplay is not subject to termination under Section 203(a) of the Copyright Act.

4. During the years when Mann wrote the Screenplay, he was employed by the Michael Mann Company (“MMCo.”), which was a “loan-out” employment company[1] that Mann formed for tax and other purposes in February 1976, and/or by other companies that he controlled or third-party companies such as Columbia

---

[1] Loan-out companies are entities that “loan” out an artist’s services on behalf of the artist. They are commonly used in Hollywood to limit personal liability and secure favorable tax treatment.

Pictures Television ("Columbia Pictures"), NBC Entertainment ("NBC"), and Warner Brothers ("Warner Bros."). As such, and as Mann repeatedly represented to Regency and its predecessors-in-interest (including Warner Bros.), the *Heat* Screenplay was a work "made for hire" within the meaning of the Copyright Act.

5. On April 29, 2026, Mann served Regency with a Notice of Termination pursuant to 17 U.S.C. § 203(a) (the "First Termination Notice"), purporting to terminate Regency's rights in the Screenplay. In this First Termination Notice, Mann purported to terminate an alleged October 1988 assignment of rights from Mann to two companies he controlled: MMCo. and ZZY, Inc. ("ZZY"). The Notice specified that the terminated work would be "Heat a/k/a The Other Side a/k/a LA Takedown a/k/a Hanna." When Regency asked to see a copy of the purported assignment, Mann admitted through his lawyer that the alleged assignment was just an *oral* communication, never reduced to writing, that Mann allegedly made on or about October 1, 1988 (the "Oral Assignment"). Mann claimed that he had just "discovered" this Oral Assignment after forgetting about it for nearly four decades.

6. The Oral Assignment on which the First Termination Notice is based supposedly derives from an oral agreement that Mann allegedly made *with himself*, in which Mann, like a Shakespearean actor playing multiple parts, simultaneously spoke on his own individual behalf, as well as on behalf of MMCo. and ZZY. He now says that after creating MMCo. in 1976 as his loan-out employer for tax and other purposes, he wrote drafts of a *Heat*-related screenplay in the early 1980s, but did not write these drafts as an employee of MMCo., even though he was still employed by MMCo. at the time. Instead, he now claims, he wrote those drafts as an unemployed author, such that these drafts were not works made for hire.

7. After receiving the First Termination Notice, Regency demanded that Mann produce the evidence for this recently "discovered" Oral Assignment. In response, Mann changed his story. He now claims that, contrary to what his First

Kendall Brill & Kelly LLP
10100 Santa Monica Blvd.
Suite 2500
Los Angeles, CA 90067

Termination Notice says, MMCo., his longtime loan-out employer, was not a party to the alleged Oral Assignment after all, and that the Oral Assignment was solely between Mann in his personal capacity and Mann as the representative of ZZY but not MMCo.

8. On May 21, 2026, Mann caused his counsel to serve Regency with a second notice of termination based on his revised "discovered" story (the "Second Termination Notice"). This time, the works to be terminated are identified as "certain screenplays written between February 1, 1981 and April 7, 1985, including Heat (a/k/a Crime Story a/k/a The Other Side a/k/a Hanna)."

9. Despite Regency's requests, Mann has produced no writing memorializing the Oral Assignment and no document showing that he wrote any portion of the Screenplay other than as an employee of MMCo., Columbia Pictures, NBC, Warner Bros., or another of his controlled companies.

10. On May 28, 2026, Mann served Regency with a third termination notice (the "Third Termination Notice"). The Third Termination Notice purports to terminate a different grant than the Oral Assignment—this time, a March 22, 1989 written assignment from Mann *and MMCo*. to Ajar, Inc., another entity controlled by Mann (the "Ajar Agreement"). The First, Second, and Third Termination Notices are referred to collectively as the "Termination Notices."

11. Unlike the Oral Assignment, the Ajar Agreement was executed in writing. In it, MMCo. and Mann conveyed to Ajar their rights to a teleplay that Mann wrote titled "Hanna," as well as to certain materials that Mann wrote for a project titled "Criminal Anthology," both of which were predecessor works to *Heat*.

12. The Ajar Agreement states on its face that the "Hanna" teleplay was written by Mann "as an employee-for-hire of MMCo. … in which Mann reserved no rights." And under contracts executed in 1976 and 1978 between MMCo. and Columbia Pictures, MMCo. loaned Mann's services to write the "Criminal

Anthology" material as a work made for hire for Columbia Pictures. Thus, every work within the scope of the Ajar Agreement is a work made for hire, and nothing conveyed by the Ajar Agreement is subject to termination under Section 203.

13. Regency maintains that the Termination Notices are invalid, ineffective, and/or do not affect Regency's rights, including on the grounds that: (a) the *Heat* Screenplay and its predecessor works were created as works made for hire, as Mann repeatedly represented, and therefore are not eligible for termination under 17 U.S.C. § 203; (b) the First and Second Termination Notices purport to terminate an oral grant, which was not "executed by the author" and therefore is not subject to termination under 17 U.S.C. § 203(a); (c) Regency's exclusive rights in the *Heat* Screenplay do not derive from, and are not affected by termination of, any non-exclusive Oral Assignment; (d) the First Termination Notice misidentifies the parties to the alleged Oral Assignment; (e) the Second Termination Notice fails to clearly identify the works to which it applies; (f) the Third Termination Notice purports to terminate the Ajar Agreement, whose conveyances were either made by MMCo., which as an employer has no right of termination under Section 203(a), or otherwise concern works expressly made for hire; (g) the First and Second Termination Notices purport to terminate the subject grant before the earliest date allowed by statute; and (h) the Termination Notices falsely state that the respective grants did not include a right of publication.

14. If given effect, the Termination Notices would purport to strip Regency, beginning in 2028, of rights it has held for more than three decades, clouding Regency's title to the Screenplay and jeopardizing its ability to develop, finance, and license works derived from it.

15. An actual controversy between Regency and Mann therefore exists and is ripe for adjudication. Through this action, Regency seeks a judicial declaration that the Termination Notices are invalid and that the Screenplay is not subject to

termination under Section 203 of the Copyright Act.

## PARTIES

16. Plaintiff Regency is a corporation organized and existing under the laws of California with its principal place of business in Los Angeles, California. Regency is a film and television studio that has produced dozens of successful and award-winning titles, including *The Revenant*, *Bohemian Rhapsody*, *Gone Girl*, *12 Years a Slave*, and others. In 1994, Regency acquired the rights to the *Heat* Screenplay, and produced the film the following year to commercial and critical acclaim. Regency still holds the rights to the *Heat* Screenplay. As a result of its rights in and to the Screenplay, Regency owns the film, television, and other rights in the *Heat* film.

17. On information and belief, Defendant Michael Mann is an individual who is domiciled in Los Angeles, California. He is a successful screenwriter and director who wrote and directed the first *Heat* film as a work made for hire.

## JURISDICTION AND VENUE

18. This Court has subject-matter jurisdiction over this action under 28 U.S.C. §§ 1331 and 1338(a) because it arises under the Copyright Act, 17 U.S.C. § 101 et seq.

19. This Court has personal jurisdiction over Defendant because Defendant resides in this State and District.

20. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because Defendant resides in this District and a substantial part of the events giving rise to the claims occurred in this District.

## FACTUAL ALLEGATIONS

### A. The History of the *Heat* Screenplay

21. Mann was the writer and director of *Heat*, a blockbuster film released in 1995 starring Robert De Niro, Al Pacino, and Val Kilmer.

Kendall Brill & Kelly LLP
10100 Santa Monica Blvd.
Suite 2500
Los Angeles, CA 90067

22. Mann developed the characters and story that became the *Heat* Screenplay over nearly two decades, beginning in 1976. As set forth below, at every stage Mann wrote that material as a work made for hire.

23. On February 6, 1976, Mann caused his loan-out corporation, MMCo., to be incorporated in California.

24. On July 8, 1976, MMCo. contracted with Columbia Pictures for Mann's services as a writer for a television film project known as "Criminal Anthology" (the "Criminal Anthology Agreement"). The Criminal Anthology Agreement provided that MMCo., acting as a loan-out company, "hereby lends to [Columbia Pictures] the services of [Mann] to render his services . . . in the writing, composition, preparation and revision of the literary material described [herein]."

25. The Criminal Anthology Agreement was a "work made for hire" agreement, and thus provided that all materials prepared for the project "shall automatically become the property of [Columbia Pictures], which shall, for this purpose be deemed to be the author and copyright proprietor thereof, Writer [Mann] acting in this connection as the employee of [Columbia Pictures]."

26. The Criminal Anthology Agreement was executed by Mann on behalf of MMCo., and Mann also signed an acknowledgment of the agreement in his personal capacity.

27. Pursuant to the Criminal Anthology Agreement, Mann wrote a teleplay for "Criminal Anthology" as a work made for hire for Columbia Pictures.

28. At least some of the characters and story for the *Heat* Screenplay originated in the teleplay that Mann wrote for the "Criminal Anthology" project.

29. The "Criminal Anthology" project was never produced. The Ajar Agreement recites that MMCo. entered into a January 24, 1978 letter agreement with Columbia Pictures (dated as of January 9, 1978) borrowing Mann's further writing services, and a "[s]ettlement agreement dated as of September 1, 1978,

Kendall Brill & Kelly LLP
10100 Santa Monica Blvd.
Suite 2500
Los Angeles, CA 90067

between Columbia Pictures Television, American Broadcasting Company and MMCo. respecting 'Anthology,'" and that "Assignor [*i.e.*, MMCo. and Mann, jointly and severally] owns certain exclusive and non-exclusive rights" in the "Criminal Anthology" material, including rights acquired under Article 16 of the WGA Basic Agreement. Whatever contractual rights Mann reacquired under the WGA Basic Agreement, the underlying material is still a work made for hire, and therefore a grant of rights in that material cannot be terminated under Section 203(a).

30. On March 22, 1989, MMCo. assigned the rights to "Criminal Anthology" to Ajar, Inc., another entity wholly owned by Mann, in connection with a teleplay tentatively titled "Hanna" that was later licensed to NBC. In Section 3(a) of the Ajar Agreement, MMCo. and Mann (individually and together, "Assignor") assigned to Ajar "all of MMCo.'s rights, title and interest in and to" the Columbia agreements and the "Rights," defined as the "Anthology Rights" and the "Hanna Rights." The Ajar Agreement defined the "Hanna Rights" by stating that "Mann wrote the teleplay tentatively entitled 'Hanna' (the 'Teleplay') based on, in part, the [Criminal] Anthology Rights, as an employee-for-hire of MMCo., pursuant to an agreement (the 'Employment Agreement') between Mann and MMCo., in which Mann reserved no rights in the Teleplay, in the performance of Mann's duties thereunder and during the regular course of Mann's employment. The Teleplay was specifically ordered and commissioned by MMCo., pursuant to the Employment Agreement between Mann and MMCo. . . . and as such is a 'work made for hire' as such term is used in the United States Copyright Act, and MMCo. is the sole and exclusive owner of the new material in the Teleplay for all purposes throughout the universe in perpetuity."

31. The Ajar Agreement further provided that "MMCo. hereby loans to Assignee Mann's further services as a writer" on the teleplay, to be rendered "as an

employee-for-hire of Assignee" and "for use as part of a motion picture or other audiovisual work."

32. The Ajar Agreement was executed by Mann on behalf of both MMCo. and Ajar. Mann also signed the Ajar Agreement in his personal capacity.

33. The Ajar Agreement makes no mention of ZZY, or of any October 1988 Oral Assignment. To the contrary, the Assignor—defined to include both MMCo. and Mann, jointly and severally—represented and warranted that Assignor had not "sold, transferred, assigned … or otherwise disposed of" any of its interest in the Columbia agreements or the Rights, and that, apart from the WGA Basic Agreement and the Columbia agreements, there were "no contracts or agreements which materially and adversely affect Assignor's rights" in them. Furthermore, in Section 3(b) of the Ajar Agreement, Mann assigned "all of Mann's rights, title and interest in and to the Incorporated Material to the extent that Assignee has not already acquired same pursuant to the Employment Agreement or otherwise."

34. Mann separately warranted in the Ajar Agreement that he had not transferred his interest in the Incorporated Material (defined as any interest Mann might have in "Criminal Anthology" under the WGA Basic Agreement) "to any person, firm or corporation other than MMCo.," and that no contracts other than the WGA Basic Agreement, the Columbia agreements, the Employment Agreement, and the Ajar Agreement adversely affected those rights. Mann, who signed the Ajar Agreement both personally and as MMCo.'s President in March 1989, would necessarily have known of any Oral Assignment he had made with ZZY only months earlier, but there was no mention of such Oral Assignment.

35. As the Ajar Agreement provides in Sections 2(b) and 5, Mann wrote the "Hanna" teleplay as a work made for hire for MMCo., and rendered any further writing services on it as a work made for hire for Ajar.

36. Also in 1989, Ajar licensed to NBC the right to acquire the "Hanna"

teleplay for the production of a television film pilot. NBC aired the television pilot as "L.A. Takedown" that same year. NBC's license expired four years later.

37. On June 1, 1994, MMCo. assigned to Warner Bros. the rights to "the material written by [Mann] for [MMCo.] as a work made for hire described as follows: the screenplay entitled 'HEAT,' including the title, themes, stories and all other contents thereof, and the characters therein, and all . . . other versions thereof and any other material pertaining or related to the foregoing . . . including material contained in the previously produced television motion picture known as 'LA Takedown' (aka 'HANNA') which material does appear or is the basis for the motion picture project presently entitled 'HEAT'[.]" (the "Warner Bros. Agreement").

38. Mann signed the Warner Bros. Agreement on behalf of MMCo. Mann also signed the Warner Bros. Agreement in his personal capacity, agreeing to be personally bound by its terms to the extent necessary.

39. As he expressly represented in the Warner Bros. Agreement, Mann wrote the *Heat* Screenplay as a work made for hire for MMCo.

40. Warner Bros. would later assign its rights to *Heat* to Warner Bros. Production Limited ("WBPL").

41. On August 9, 1994, WBPL and MMCo. executed a "Certificate of Employment (Loanout)" for Mann's services as a producer/director for the *Heat* film. The Certificate of Employment, signed by Mann, stated that all materials "at any time heretofore or hereafter created or contributed by [MMCo.] and/or [Mann] . . . which in any way relate to the Picture [*Heat*] or to the material on which the Picture will be based[[2]] . . . are and shall be deemed to be works made for hire."

---

[2] The Certificate of Employment expressly references "the previously produced television motion picture known as 'LA Takedown' (aka 'HANNA')" as such underlying source material.

Kendall Brill & Kelly LLP
10100 Santa Monica Blvd.
Suite 2500
Los Angeles, CA 90067

42. On October 1, 1994, WBPL assigned to Monarchy Enterprises, B.V. (“MEBV”)—an affiliate of Regency at the time—“[a]ll right, title and interest . . . to all screenplay material written by Michael Mann entitled ‘HEAT’ (the ‘Work’), including, without limitation, all present and future revisions, adaptations, sequels, versions, dramatizations and translations thereof, and the copyright thereof and all renewals and extensions of such copyright.” The foregoing interests of MEBV were assigned to Regency Entertainment (USA), Inc.—an affiliate of Regency—as of January 1, 1995, certain rights of which in turn were assigned to Regency.

43. In a letter dated July 8, 1994, Mann’s attorney, Harold Brown, wrote to Warner Bros. in part to explain the history of the development of the *Heat* Screenplay (the “Brown Letter”). The Brown Letter explained how some of the story and characters for *Heat* originated in the “Criminal Anthology” teleplay, were rewritten by Mann in 1981-82 into a *Heat* screenplay, and were also utilized in the NBC television movie “L.A. Takedown a/k/a Hanna,” produced by Ajar. The Brown Letter did not mention the entity ZZY or any oral assignment of any kind. Nor did the Brown Letter disclose that any portion of the *Heat* Screenplay was not a work made for hire, or that, as Mann now claims, Mann wrote any portion of the *Heat* Screenplay as an unemployed writer rather than as an employee of MMCo. and/or other loan-out companies that he controlled and used during the relevant time.

44. All of the versions of *Heat* evidenced in the contractual chain-of-title documentation—the “Criminal Anthology” teleplay, the “L.A. Takedown”/“Hanna” teleplay, and the *Heat* Screenplay itself—are described as works made for hire in contracts signed by Mann, as detailed above. Section 201(b) of the Copyright Act provides: “In the case of a work made for hire, the employer or other person for whom the work was prepared is considered the author ….” 17 U.S.C. § 201(b). Thus, Mann is not, for purposes of Section 203 of the Copyright Act, the “author” of

Kendall Brill & Kelly LLP
10100 Santa Monica Blvd.
Suite 2500
Los Angeles, CA 90067

the Screenplay or of its predecessor works.

45. Regency produced the *Heat* film, and entered into an agreement with Warner Bros. to distribute the film. *Heat* premiered on December 15, 1995 to critical acclaim and commercial success.

## B. The *Heat 2* Film Project

46. In August 2022, Mann released a novel titled *Heat 2*.

47. As a result of Regency's ownership of the Screenplay and the 1995 film *Heat*, Regency holds film, television and certain other rights in and to the novel titled *Heat 2*.

48. On November 28, 2022, Regency licensed to Forward Pass, Inc. the rights to write and direct a film sequel to the original *Heat* film, based upon the *Heat 2* novel. Forward Pass is the same entity as MMCo.; Mann simply changed its corporate name in 1996. Regency's compensation for the license is contingent in part on the release and box office success of the *Heat 2* film.

49. On April 13, 2023, Warner Bros. contracted for Mann's services as a writer for the screenplay for *Heat 2*, which contract provided that the written materials "are and shall be deemed to be works made for hire for [Warner Bros.]."

50. Also on April 13, 2023, Regency granted Warner Bros. the right to co-produce a film version of *Heat 2*. Regency's compensation for this license is again contingent in part on the release and box office success of the *Heat 2* film. Warner Bros.'s rights to *Heat 2* under that license reverted to Regency when Warner Bros. declined to proceed with the project.

51. On or about October 8, 2026, Mann executed a new grant of rights to Amazon Content Services LLC ("Amazon") for any rights to the *Heat 2* film that he may personally recapture as a result of the Termination Notices.

52. On October 16, 2026, Regency executed an agreement granting to Amazon certain of Regency's rights to *Heat 2*.

53. The agreements described in paragraphs 51 and 52 between Mann and Amazon, and Regency and Amazon, relating to *Heat 2*, made express reference to the Termination Notices and their disputed nature. Both agreements make clear that certain of Mann's and Regency's representations concerning title to the *Heat* Screenplay are contingent upon the outcome of this dispute concerning the validity of the Termination Notices.

54. Principal photography on the *Heat 2* film is currently scheduled to begin in or about January 2027.

**C. <u>Mann's Attempts to Terminate the *Heat* Copyright Grants.</u>**

55. On April 29, 2026, Mann served Regency with the First Termination Notice.

56. The First Termination Notice purports to terminate "all exclusive or nonexclusive grants of transfer or license of copyright" for the work "Heat a/k/a The Other Side a/k/a LA Takedown a/k/a Hanna," "including without limitation the Agreement dated on or about October 1, 1988, between Michael Mann, on the one hand, and ZZY, Inc. and the Michael Mann Company, Inc., on the other hand."

57. The First Termination Notice lists the grantee and "grantee's successor in title, whose rights are being terminated," as ZZY, MMCo., Ajar, and Regency.

58. Before receiving the First Termination Notice, Regency was not aware of any agreement between Mann, ZZY, and MMCo. dated October 1, 1988.

59. When Regency asked Mann's representatives to provide this agreement, Mann's response was that the agreement was not a written agreement, but instead an oral assignment from Mann to the two companies he controlled in 1988—*i.e.*, a "communication" between Mann in his personal capacity and Mann as a corporate representative—and that no written documentation of it exists.

60. When Regency asked to see evidence of the purported Oral Assignment, Mann's story changed. The new story, on which the Second

Kendall Brill & Kelly LLP
10100 Santa Monica Blvd.
Suite 2500
Los Angeles, CA 90067

Termination Notice is based, is that the Oral Assignment was between Mann and ZZY only. Leaving aside the inherent implausibility of this shifting account of an oral communication Mann supposedly conducted with himself in 1988 and then "forgot" for decades, Mann has thus conceded that the First Termination Notice inaccurately described the purported grant being terminated. That is an independent defect, because a notice of termination under Section 203 must accurately identify the grant to be terminated. *See* 37 C.F.R. § 201.10(b). Nevertheless, Mann has not withdrawn the First Termination Notice.

61. On May 21, 2026, Mann served Regency with the Second Termination Notice. The Second Termination Notice referred to the same October 1, 1988 Oral Assignment as the grant being terminated, but this time stated that the transfer was only between Mann and ZZY, and that the affected works subject to termination were limited to "certain screenplays written between February 1, 1981 and April 7, 1985." This would be after the 1976 "Criminal Anthology" teleplay, which Mann subsequently represented was the genesis of the *Heat* Screenplay, and which was written pursuant to the Criminal Anthology Agreement on a work-made-for-hire and loan-out basis. It would also be after Mann incorporated MMCo. as his loan-out company and had been using it since 1976 to employ his writing services.

62. The Second Termination Notice's reference to unidentified "certain screenplays" written over a four-year period does not clearly identify the copyrighted works to which it applies, as the regulations promulgated under the Copyright Act, 37 C.F.R. § 201.10, require. Mann has refused Regency's requests to further identify or produce those "certain screenplays." The Second Termination Notice nonetheless purports to name Regency as a "successor grantee" whose rights it terminates, along with ZZY, MMCo., Ajar, and Warner Bros.

63. Moreover, pursuant to Sections 101 and 204(a) of the Copyright Act, a transfer of an exclusive copyright license must be in writing. Because the Oral

Assignment was not executed in writing, the most it could convey would be a non-exclusive license, not an assignment of exclusive rights.

64. However, at all times from 1994 through April 2026, Mann and his loan-out corporations maintained that they were granting *exclusive* rights in the *Heat* Screenplay to Warner Bros. and its successors in interest—both when Mann and his loan-out companies entered into agreements for the production and distribution of the *Heat* film, and again in recent negotiations concerning derivative works. That representation contradicts Mann's recent claim of an Oral Assignment, as described in the First and Second Termination Notices.

65. Furthermore, even if Mann had transferred rights to ZZY in an oral "conversation," that conveyance of a *non-exclusive* interest could not affect Regency's rights as an *exclusive* rightsholder. This means that even if either the First or Second Termination Notice were otherwise valid, Regency's rights would not be affected as Regency's exclusive rights would not derive from a non-exclusive Oral Assignment.

66. Moreover, although the First and Second Termination Notices state that the Oral Assignment did *not* include a right of publication, Mann's counsel has since represented in correspondence with Regency that the Oral Assignment from Mann to ZZY specifically included a license of "theatrical exhibition, and allied rights." A license of theatrical exhibition rights in a motion picture necessarily contemplates distributing copies of the picture to theaters for public performance, which constitutes "publication" under 17 U.S.C. § 101. By Mann's own account, then, the Oral Assignment included a right of publication, and the First and Second Termination Notices misdescribe the grant they purport to terminate.

67. Further still, even if the Oral Assignment were subject to termination under Section 203, the First and Second Termination Notices purport to be effective before the statute allows for such termination. Under 17 U.S.C. § 203(a)(3), if a

grant of a copyright includes the right of publication, termination of the grant can only be effected *after* forty years from the date of execution of the grant or thirty-five years from the date of publication of the work under the grant, whichever is earlier. The First and Second Termination Notices state that the effective dates of termination are April 30, 2028 and May 22, 2028, respectively. Both dates, however, are less than 40 years after the alleged October 1, 1988 date of the purported Oral Assignment (the date of execution of the grant) and less than 35 years after the *Heat* film was initially released to movie theaters on December 15, 1995.

68. Because the alleged grant covered the right of publication, the earliest permissible effective date of termination is the earlier of thirty-five years from publication (December 15, 2030, based on *Heat*'s December 15, 1995 theatrical release) or forty years from execution of the grant (October 1, 2028, based on the alleged October 1, 1988 Oral Assignment)—that is, October 1, 2028. The effective dates stated in the First and Second Termination Notices, April 30, 2028 and May 22, 2028, both precede that date.

69. For this additional reason, the First and Second Termination Notices are defective and invalid.

70. On May 28, 2026, Mann served Regency with the Third Termination Notice.

71. The Third Termination Notice purports to terminate "all exclusive or nonexclusive grants of transfer or license of copyright," executed as of March 22, 1989, for the works "Criminal Anthology; Hanna (a/k/a L.A. Takedown a/k/a Made in L.A. a/k/a L.A. Crimewave)" "including without limitation the Assignment dated as of March 22, 1989, between Ajar, Inc., on the one hand, and The Michael Mann Company, Inc. and Michael K. Mann, on the other hand."

72. The Third Termination Notice thus purports to terminate the Ajar

Agreement.

73. The Ajar Agreement, which was executed in writing, states on its face that the teleplay tentatively titled “Hanna” was written by Mann as an employee-for-hire of MMCo., that Mann “reserved no rights” in it, that MMCo. is its sole and exclusive owner, and that any further writing services on the teleplay would be works made for hire for Ajar. Thus, under Section 201(b) of the Copyright Act, MMCo., not Mann, is the “author” of the “Hanna” teleplay.

74. The remaining subject matter of the Ajar Agreement—the Columbia agreements, the “Anthology Rights,” and the “Incorporated Material”—consists of rights in the Criminal Anthology material, which Mann wrote as a work made for hire for Columbia.

75. Because every work within the scope of the Ajar Agreement is a work made for hire, the Ajar Agreement is not subject to termination under Section 203.

76. Moreover, the only grant in the Ajar Agreement of an interest held by Mann personally is set forth in Section 3(b) of the Agreement. The remaining grant, in Section 3(a), conveyed “MMCo.’s rights, title and interest,” and thus is MMCo.’s grant, not one “executed by the author.” An employer is not permitted to exercise termination rights under Section 203(a), and a writer like Mann cannot take advantage of the loan-out structure and then disregard it when convenient. Section 3(b) does not save the Third Termination Notice, because it is confined to “Criminal Anthology” material that was a work made for hire for Columbia, and it excludes whatever Ajar had already acquired under Mann’s Employment Agreement with MMCo. For these additional reasons, the Ajar Agreement is not subject to termination under Section 203.

77. Additionally, the Third Termination Notice claims that the Ajar Agreement did not contain a right of publication, but that is not true. Section 3(a) assigned “all of MMCo.’s rights, title and interest,” which Section 2(b) describes as

"all copyrights and all other rights," "with the right to make such changes and uses thereof as it may determine." That conveyance necessarily includes the right of publication. The Third Termination Notice thus misstates the nature of the grant at issue.

78. For all the foregoing reasons, the Third Termination Notice is invalid and defective.

## CAUSES OF ACTION

## FIRST CAUSE OF ACTION

### (Declaratory Relief)

79. Plaintiff re-alleges and incorporates by reference each of the prior paragraphs as though fully set forth herein.

80. An actual controversy has arisen and now exists between the parties in that Mann purports to have terminated grants of copyright in the Screenplay on which Regency relies, and Regency maintains that such terminations are invalid, ineffective, and/or do not affect Regency's rights, including on the grounds that: (a) the *Heat* Screenplay and its predecessor works were created as works made for hire, and therefore are not eligible for termination under 17 U.S.C. § 203; (b) the grant that the First and Second Termination Notices purport to terminate is an oral grant, which thus was not "executed by the author" in writing and therefore is not subject to termination under 17 U.S.C. § 203(a); (c) Mann represented that he and his controlled companies were granting exclusive rights in the *Heat* Screenplay, but under 17 U.S.C. § 204(a) an oral grant cannot convey exclusive rights, and Regency's exclusive rights therefore do not derive from, and are not affected by termination of, any non-exclusive Oral Assignment; (d) the First Termination Notice misidentifies the parties to the alleged Oral Assignment; (e) the Second Termination Notice fails to clearly identify the works to which it applies; (f) the Third Termination Notice purports to terminate the Ajar Agreement, whose conveyances

Kendall Brill & Kelly LLP
10100 Santa Monica Blvd.
Suite 2500
Los Angeles, CA 90067

were either made by MMCo., which as an employer has no right of termination under Section 203(a) or, as to Mann's limited Section 3(b) grant, concern "Criminal Anthology" material that is a work made for hire for Columbia, and further states falsely that the grant did not include a right of publication; and/or (g) the First and Second Termination Notices purport to terminate the subject grant before the earliest date allowed by statute and misdescribe the purported Oral Assignment as excluding a right of publication.

81. Pursuant to 28 U.S.C. § 2201(a), Plaintiff seeks a judicial declaration that the Termination Notices are null and void, that the *Heat* Screenplay is not eligible for copyright termination under 17 U.S.C. § 203, and that Regency retains all rights to the Screenplay according to the transfers, licenses, and/or assignments it received and to the fullest extent allowed by law.

82. Such a declaration is timely and necessary. The Termination Notices cloud Regency's title to the Screenplay and impair its ability to develop, finance, and license works derived from it. In addition, certain provisions of the agreements that Mann and Regency each entered into with Amazon with respect to *Heat 2* depend on the outcome of this litigation.

## **PRAYER FOR RELIEF**

WHEREFORE, Regency respectfully requests that this Court enter judgment in its favor against Defendant as follows:

A. That judgment be entered in favor of Plaintiff and against Defendant;

B. That a declaratory judgment be entered declaring that the Termination Notices are null and void, that the *Heat* Screenplay is not eligible for copyright termination under 17 U.S.C. § 203, and that Regency retains all rights to the Screenplay according to the transfers, licenses, and/or assignments it received and to the fullest extent allowed by law;

C. That Plaintiff be awarded any reasonable attorneys' fees, costs, or other

expenses recoverable under law; and

D. That Plaintiff be granted such other and further relief as the Court may deem just and proper.

Respectfully submitted,

DATED: November 13, 2026

KENDALL BRILL & KELLY LLP

By: */s/ Richard B. Kendall*
Richard B. Kendall
Attorneys for Plaintiff New Regency Productions, Inc.